## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CH Bus Sales, Inc., *f/k/a/ CH Trading Company, and its subsidiaries CH Bus Sales Holdings, LLC and CH Bus Sales, LLC*, | Case No. 18-cv-2444 (SRN/KMM) |
|         Plaintiff, | |
| v. | |
| Duane Geiger, *individually*, and REV Group, Inc., *a Delaware corporation*, | |
|         Defendants, | |
| and | |
| Duane Geiger, *individually and as a shareholder of CH Bus Sales, Inc.*, | **MEMORANDUM OPINION AND ORDER** |
|         Third-Party Plaintiff, | |
| v. | |
| Michael Haggerty, *individually*, | |
|         Third-Party Defendant, | |
| and | |
| CH Bus Sales, Inc., | |
|         Nominal Defendant. | |

Richard M. Dahl and Brandt F. Erwin, Madigan Dahl & Harlan, P.A., 222 South Ninth Street, Suite 3150, Minneapolis, MN 55402 for Plaintiff and Nominal Defendant.

Edward B. Magarian and Brianna Al Taqatqa, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402 for Defendant REV Group.

Shannon M. McDonough, Bradley R. Hutter, and Tyler P. Brimmer, Fafinski Mark & Johnson, P.A., 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344 for Defendant and Third-Party Plaintiff Duane Geiger.

Garth G. Gavenda, Lindsay W. Cremona, and T. Christopher Stewart, Anastasi Jellum, P.A., 14985 North 60th Street, Stillwater, MN 55082 for Third-Party Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

In December 2017, Defendant Duane Geiger resigned from his position as President and CEO of Plaintiff CH Bus Sales ("CHB"), where he had worked for several years. A few months later, he began working at Defendant REV Group ("REV"), a competitor of CHB's in the luxury motor coach market. CHB has now sued both REV and Geiger for a number of alleged legal violations, largely arising out of the non-compete, non-solicitation, and confidentiality provisions Geiger signed with CHB while he was employed there. Geiger and REV have moved for judgment on the pleadings as to all of the claims CHB asserts against them, both individually and collectively.

After carefully reviewing the record and applicable case law, the Court grants Defendants' motion in part and denies it in part.

## I.    BACKGROUND

In describing the background of this case, the Court assumes as true the factual allegations in CHB's complaint and construes all reasonable inferences from those facts in

the light most favorable to CHB. *See Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, 871 F. Supp. 2d 843, 851 (D. Minn. 2012) (noting that the same standard applies to motions to dismiss under Rule 12(b)(6) and motions for judgment on the pleadings under Rule 12(c)). Further, while the Court considers "materials that are necessarily embraced by the pleadings" in this background section, it "ignore[s] materials outside the pleadings." *Id.* For instance, though the Court does consider the exhibits attached to the complaint, like the at-issue Employment Agreement, it does *not* consider the allegations made against CHB in Defendants' counterclaims and third-party complaints (*see* Doc. Nos. 14, 18, 20), or the assertions made by CHB in a separate litigation it is engaged in in Delaware. *See Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014); *but cf.* Defs.' Br. in Support of J. on the Pleadings ("Defs.' Br.") [Doc. No. 38] at 5 (requesting that the Court take judicial notice of allegedly "contradictory assertions" made by CHB in that legal proceeding).[1]

## A. The Parties

Plaintiff CHB is a Delaware corporation with its principal place of business in Minnesota, and it is involved in the distribution of "luxury motor coaches." (Compl. [Doc. No. 1-2] ¶¶ 1, 9.) According to the Complaint, CHB "has steadily grown . . . from a startup company to a full-service distributor, offering sales, service, finance, and after-sales support throughout the United States and Canada," to the point where it now employs approximately

---

[1]    Moreover, as noted below, even if the Court did consider the Delaware litigation, it would not change this decision.

35 employees across four offices. (*Id.* ¶ 10.) Moreover, since January 2010, CHB has been the "exclusive distributor of TEMSA motor coaches in the United States and Europe." (*Id.*)[2]

Defendant REV is a Delaware corporation with its principal place of business in Wisconsin, and it is involved in the "design[], manufacture[], and distribut[ion] [of] specialty vehicles and related aftermarket parts and services, including commercial busses." (*Id.* ¶ 4; REV Am. Answer [Doc. No. 14] ¶ 4.) REV and CHB are competitors. (Compl. ¶ 4.)

Defendant Duane Geiger is a Minnesota resident with extensive experience in the motor coach industry. (*Id.* ¶¶ 5, 23; Geiger Am. Answer [Doc. No. 18] ¶¶ 5, 23.) From August 2011 through December 20, 2017, Geiger held various senior positions at CHB, including a several-month term as President and CEO. (*Id.* ¶¶ 5, 23; Geiger Am. Answer [Doc. No. 18] ¶¶ 5, 23.) Sometime in 2018, following his resignation from CHB, Geiger began working as "the general manager of the bus division for REV." (Compl. ¶ 41; Geiger Am. Answer ¶ 41.) However, because of stock he received during his tenure at CHB, Geiger retains a minority ownership interest in CHB. (*See* Compl. ¶ 24; Geiger Am. Answer ¶ 24.)[3]

### B. Factual History

1. ***Duane Geiger Joins CHB in August 2011 and Signs Employment and Shareholder Agreements***

---

[2]     TEMSA is a "Turkish motor coach manufacturer that manufactures full and midsize luxury motor coaches on a worldwide basis." (*Id.* ¶ 9.) As alluded to above, TEMSA and CHB are currently in litigation in Delaware over the terms of CHB's exclusive distribution contract with TEMSA. (*See generally* Doc. No. 40-1 to 40-3.)

[3]     Geiger has also filed a third-party complaint against Michael Haggerty, who appears to be CHB's controlling shareholder. (*See* Geiger Third-Party Complaint [Doc. No. 20] ¶ 2.) However, because this third-party complaint is irrelevant to the present motion, the Court will not discuss Haggerty any further.

As part of a "strategic business plan" to "develop the customer base and market for TEMSA's luxury motor coaches," in the summer of 2011, CHB recruited Geiger, a "seasoned bus professional," to become CHB's Executive Vice President of Sales/Service. (Compl. ¶¶ 22-24.) "In recognition of the anticipated important role Geiger was intended to play within CHB, the company offered Geiger a lucrative base salary starting at $200,000 per year, plus bonuses, stock options, and executive benefits." (*Id.* ¶ 24.) Most importantly for present purposes, though, on or about August 31, 2011, Geiger signed an Employment Agreement with CHB. (*Id.* ¶ 26; *see* Compl. Ex. 1 ("Employment Agreement").) Although the Agreement defined Geiger's job as "Executive Vice President," the Agreement was subject to automatic one-year renewals, unless terminated by written notice, and stated that it could "be modified only in writing, signed by both parties." (*Id.* §§ 1, 2, 17.)

This Agreement contained three important provisions. *First*, the Agreement barred Geiger from disseminating confidential information received "during the course of [his] employment," including *after* his employment, unless it was necessary to perform his duties or "the information cease[d] to be confidential through legitimate means." (*Id.* § 8 ("Confidentiality Provision").) *Second*, the Agreement barred Geiger from soliciting "any current or prospective [CHB] customers, clients, employees, vendors, or suppliers," or from recruiting "any employee of [CHB] for any other work or employment," during his employment, "and for a period of two years following the termination of [his] employment." (*Id.* § 12.b-12.c ("Non-Solicitation Provision").) *Third*, the Agreement barred Geiger from "compet[ing], directly or indirectly, with [CHB], or enag[ing], assist[ing], or participat[ing] . . . in any business or businesses substantially similar to or competitive to the business now or

hereafter conducted by [CHB]," during his employment, "and for a period of two years following the termination of [his] employment." (*Id.* § 12.a ("Non-Compete Provision").)

In addition, in the fall of 2011, Geiger was elected to CHB's board of directors and then provided with "125 shares of the company's stock." (Compl. ¶¶ 33-34.) In consideration for this stock, Geiger signed a separate Shareholder Agreement with CHB. (*Id.* ¶ 34.) This Agreement required Geiger, like all shareholders, "to forever maintain the confidentiality of all of [CHB's] proprietary information." (*Id.*)[4]

According to CHB, these confidentiality agreements were important because "CHB has succeeded as a business in large part because of its valuable confidential and proprietary information and the strategic relationships it has developed in the niche luxury motor coach market." (*Id.* ¶ 11.) CHB generically lists its "confidential information" and "trade secrets" as "customers, customer lists, customer needs and preferences, customer buying habits, customer contracts, sales, employee lists, financial information, policies and procedures, projects, business practices, methodologies, strategic plans, financial affairs, pricing, [and] vendor relationships." (*Id.* ¶¶ 13-14.) Moreover, in addition to having its employees, shareholders, and directors sign confidentiality agreements, like the ones Geiger signed here, CHB protects its confidential information, "to the extent it exists in physical forms," by keeping it in "secured file cabinets." (*Id.* ¶¶ 18-19.) CHB alleges that Geiger had access to these kinds of "confidential information" and "trade secrets" during his time at CHB. (*Id.* ¶ 29.)

---

[4]     CHB did not attach a copy of the Shareholder Agreement to the Complaint, as it did with Geiger's Employment Agreement.

The Complaint also alleges that REV expressed a desire to "potentially acquir[e] CHB" in 2016. (*Id*. ¶ 36.) To that end, CHB signed a Non-Disclosure Agreement with REV and subsequently shared confidential information with REV "in connection with REV's due diligence efforts." (*Id*. ¶ 37.) However, in July 2016, REV "abruptly disengaged with CHB." (*Id*. ¶ 38.) Over a year later, CHB alleges, "REV entered into a separate agreement with Daimler AG to distribute Setra brand coaches throughout the United States and Canada," which "position[ed] REV to directly compete with CHB in the luxury bus market." (*Id*.; *see also* REV Am. Answer ¶ 38 (admitting that "REV entered into an agreement with Daimler AG to distribute Setra coaches," but denying "any suggestion that Daimler AG currently distributes TEMSA coaches").)

### 2. *CHB Appoints Geiger President and CEO in March 2018; Several Months Later, Geiger Resigns*

On or about March 1, 2017, CHB promoted Geiger to President and CEO, and increased Geiger's base pay to $360,000. (Compl. ¶ 27.) The Complaint does not allege that the confidentiality, non-compete, and non-solicitation obligations found in Geiger's Employment Agreement ceased to exist once Geiger accepted this promotion.

On or about December 20, 2017, Geiger "abruptly resigned from his employment with CHB." (*Id*. ¶ 39; Geiger Am. Answer ¶ 39 (admitting that Geiger resigned from CHB around this time).)[5]

---

[5]    In Geiger's counterclaim and third-party complaint, he alleges that he resigned from CHB in response to purportedly fraudulent and illegal behavior occurring at the company. However, as the Court noted above, the Court will not consider those allegations in reviewing this motion.

### 3. *Geiger Allegedly Violates His Employment Agreement by Joining REV and Then Contacting a CHB Employee*

Following Geiger's resignation, CHB "learned that Geiger [was] considering seeking employment with REV and/or one of [CHB's] other competitors." (Compl. ¶ 40.) As such, on February 27, 2018, CHB sent Geiger a letter reminding him of the Employment Agreement's confidentiality, non-solicitation, and non-compete provisions, discussed *supra*. (*Id.* ¶ 40; *see* Compl. Ex. 2 ("Feb. 27, 2018 Letter").) Nonetheless, CHB alleges, Geiger "accepted employment with REV as the general manager of the bus division for REV." (Compl. ¶ 41; Geiger Am. Answer ¶ 41.)[6] CHB further alleges that, after Geiger began working at REV, he offered a long-time CHB employee named Marvin Borntrager a job, which caused Mr. Borntrager to resign from CHB. (Compl. ¶ 42; *but see* Geiger Am. Answer ¶ 42 (denying this allegation).) CHB also alleges that, "although [it] does not yet know the full extent of Geiger's unlawful competition and violation of his contractual, statutory, and common-law obligations," it believes that Geiger has misappropriated CHB confidential information and trade secrets, and is using this information for the benefit of REV. (*See generally* Compl. ¶¶ 43, 50-51, 85, 92, 97.) CHB similarly alleges that REV intentionally assisted Geiger in taking these actions, with full knowledge of Geiger's Employment Agreement, and is reaping the rewards of Geiger's alleged misconduct. (*See, e.g.*, *id.* ¶¶ 85-90.)

---

[6]    Although Defendants' briefing states that Geiger began working for REV in April 2018, and CHB does not appear to dispute this fact, this allegation is not found in the pleadings and will accordingly not be considered in this motion. (*See, e.g.*, Defs.' Br. at 3.)

### C. Procedural History

On July 20, 2018, CHB filed the present complaint in Hennepin County District Court. In its complaint, CHB asserted (at least) eight claims against REV and Geiger: (1) breach of contract against Geiger; (2) tortious interference with contractual relations against REV; (3) breach of "contractual, statutory, and common law" fiduciary duties against Geiger; (4) state law misappropriation of trade secrets against REV and Geiger; (5) federal law misappropriation of trade secrets against REV and Geiger; (6) unjust enrichment against REV and Geiger; (7) unfair competition against REV and Geiger; and (8) tortious interference with actual and prospective business relations against REV and Geiger.

On August 21, 2018, Defendants jointly removed this case to federal court, asserting federal question jurisdiction for the federal law trade secrets claim, and supplemental jurisdiction with respect to the other, state law claims. (*See* Notice of Removal [Doc. No. 1].)[7] Defendants subsequently filed answers, and amended answers, followed by the present motion for judgment on the pleadings. The parties submitted full briefing on the motion, and the Court entertained oral argument on December 14, 2018. (*See* Defs.' Br. in Support of J. on the Pleadings ("Defs.' Br.") [Doc. No. 38]; Pl.'s Br. in Opp. to J. on the Pleadings ("Pl.'s Br.") [Doc. No. 42]; Defs.' Reply Br. [Doc. No. 43].)

## II.    DISCUSSION

Federal Rule of Civil Procedure 8 requires that a complaint present "a short and plain statement of the claim showing that the [plaintiffs are] entitled to relief." Fed. R. Civ. P. 8(a).

---

[7]    Because Plaintiff CHB and Defendant Geiger are both Minnesota citizens, Defendants could not assert diversity jurisdiction under 28 U.S.C. § 1332.

A defendant, in turn, answers the plaintiff's complaint by "admit[ting] or deny[ing] the allegations asserted against it," and by raising affirmative defenses. Fed. R. Civ. P. 8(b). Once these "pleadings" "are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Just as with a motion to dismiss under Fed. R. Civ. 12(b)(6), a court may only grant a motion for judgment on the pleadings if the complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gorog*, 760 F.3d at 792 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although "[t]he plausibility standard is not akin to a probability requirement," it does require a complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id*. Moreover, the Court need not accept as true "legal conclusions or 'formulaic recitations of the elements of a cause of action.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).

The Complaint sets forth eight claims in total. Defendants move for judgment on the pleadings as to all of them. For ease of reference, the Court has grouped Plaintiff's claims into four categories: (A) contract claims, (B) fiduciary duty claims, (C) trade secret claims, and (D) miscellaneous claims. The Court will address each category in turn.

## A.   The Contract Claims

This section encompasses two different claims: CHB's breach of contract claim against Geiger, and CHB's tortious interference with contractual relations claim against REV. Because the parties treated these claims as essentially the same in their briefing, the Court will do likewise here.

### 1. The Law[8]

Under Delaware law, a breach of contract claim has four elements: "(1) the existence of a contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003). Similarly, a tortious interference with contractual relations claim has five elements: "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987).

"In analyzing a contract on a motion to dismiss under Rule 12(b)(6), the Court must interpret ambiguous provisions in the light most favorable to the nonmoving party." *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 881 (Del. Ch. 2009) (citing *VLIW Tech.*, 840 A.2d at 615). Indeed, because "the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions," "[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."

---

[8]     Because the Employment Agreement contains a Delaware choice of law provision, the Court references Delaware law in this section. (*See* Employment Agreement § 16.)

*VLIW Tech.*, 840 A.2d at 615; *accord In re FAH Liquidation Corp.*, 581 B.R. 98, 107 (Bankr. D. Del. 2017).

Further, under Delaware law, "a restrictive covenant, such as a non-competition provision, is enforceable if: (1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities." *Kan-Di-Ki, LLC v. Suer*, No. 7939 (VCP), 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

### 2.   Analysis

Here, CHB alleges that (1) Geiger breached his Employment Agreement, and (2) REV tortiously interfered with this Agreement because it knew that Geiger was bound by it (as evidenced by the February 27, 2018 letter), but nonetheless hired Geiger (and used Geiger's knowledge of confidential CHB information) in direct breach of the Agreement's provisions. (*See generally* Pl.'s Br. at 17-24.) Defendants defend against these allegations in two ways. First, with respect to both the breach and tortious interference claims, Defendants argue that the Employment Agreement "expired months before Geiger resigned," when CHB promoted Geiger to President and CEO, and was thereafter unenforceable. (Defs.' Br. at 7-10.) In the alternative, Defendants also argue that (a) the breach claim against Geiger must fail because CHB has no "legitimate economic interest" in enforcing its Employment Agreement (*id.* at 18-19), and (b) the tortious interference claim against REV must fail because CHB does not plausibly allege that "REV intentionally procured a violation of the [Employment Agreement], and did so without justification." (*Id.* at 21.)

With respect to Defendants' first argument, the Court finds that the Employment Agreement is, at best, ambiguous as to whether it expired upon Geiger receiving a promotion from Executive Vice President to President and CEO. Although Defendants contended at the motion hearing that an oral agreement between Geiger and CHB relieved Geiger of the Employment Agreement's various at-issue provisions (Dec. 14, 2018 Hr'g Tr. at 24), there is very little support in the pleadings for this reading of the contract.[9] Of course, the Court acknowledges that, on its face, the Employment Agreement *could* support a reading that it applied solely to Geiger's position as Executive Vice President. For example, the Agreement lists Geiger's employment as "Executive Vice President," and does not expressly contemplate promotions or changes in salary. However, the Court finds that other aspects of the contract support CHB's reading, namely, the continual use of the phrase "during the course of your employment with CHB," the automatic renewal periods, and the common sense notion that companies generally do not relieve high-ranking executives of their confidentiality, non-compete, and non-solicitation obligations absent a written modification to their contract. Given these ambiguities, the Court cannot find that Defendants' interpretation of the Employment Agreement "is the *only* reasonable construction as a matter of law," and will accordingly not grant Defendants' motion on the

---

[9]     Indeed, Defendants' primary support for this argument seems to come from the allegations in their Counterclaim. (*See, e.g.*, Geiger Counterclaim [Doc. No. 18] ¶¶ 7-11 (alleging that "Michael Haggerty and Geiger orally negotiated the terms of a new employment agreement for Geiger").) However, those allegations may not properly be considered at this stage.

ground that CHB failed to plausibly allege the existence of an employment contract covering Geiger's tenure as President and CEO. *VLIW Tech.*, 840 A.2d at 615.

The Court also finds Defendants' other arguments unpersuasive. First, Defendants' argument that the Employment Agreement is unenforceable appears to be based solely on the notion that the "Delaware litigation with TEMSA" shows that "CHB has no viable economic interest to protect by enforcing the Employment Agreement," because, in that litigation, CHB alleged that TEMSA's refusal to abide by the companies' exclusive distribution contract "destroyed" CHB's goodwill and otherwise harmed its business. (Defs.' Br. at 19.) However, not only is it inappropriate to consider (disputed) allegations from a separate litigation at the pleadings stage, but allegations concerning a dispute between CHB and one of its key clients do not conclusively establish that CHB has no "legitimate economic interest" in preventing Geiger from working at a company CHB describes as a "direct competitor." (*See, e.g.*, Compl. ¶ 41.) Indeed, Defendants do not cite any case law directly in support of this argument, and the one case they do cite supports the enforceability of contractual provisions like those at issue here. *See Kan-Di-Ki*, 2015 WL 4503210, at *19 (upholding five-year non-compete provision covering the entire western half of the United States); *see also O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108 (JOH), 2011 WL 379300, at *4 (Del. Sup. Ct. Jan. 14, 2011) (finding, at the pleadings stage, that a company had a legitimate economic interest in enforcing its non-compete agreement because the pleadings averred that the company was "actively engaged" in the relevant market).

Second, Defendants argue that it is "not plausible" that REV "intentionally interfered" with Geiger's Employment Agreement because "the Employment Agreement expired by its

own terms months before Geiger left CHB," and because REV only hired Geiger after "CHB forced [Geiger] to choose between unethical and/or illegal conduct and continued employment and service on CHB's Board of Directors." (Defs.' Br. at 21 (citing Geiger Counterclaim ¶¶ 18-28, 79).) However, neither of these arguments is availing. As the Court noted above, the Employment Agreement could reasonably be understood to continue to apply to Geiger even after his promotion to President and CEO. This is especially so because of the February 27, 2018 letter, which provided REV and Geiger notice that CHB intended to enforce the Employment Agreement were REV to hire Geiger. Moreover, as the Court has noted throughout this opinion, allegations contained in Geiger's counterclaim cannot be considered at this procedural juncture. Finally, although CHB did not need to allege a motive for REV's actions to plausibly state a tortious interference claim under Delaware law, the Court also finds plausible CHB's argument for why REV would have intentionally induced Geiger to breach the Employment Agreement. (*See* Pl.'s Br. at 32 ("[O]ne plausible theory [for why REV intentionally procured a violation of the Employment Agreement] is that REV, an attempted suitor of CHB, jaded that its acquisition of CHB fell through, sought to capitalize on CHB's business, without paying for it, by hiring its key executives in violation of binding employment agreements in order to steal CHB's business.").) Although CHB's theory of tortious interference is not necessarily "probable," the Court nonetheless finds CHB's allegations of tortious interference sufficiently "plausible" to state a claim at this stage. *See Iqbal*, 556 U.S. at 678 (noting that "[t]he plausibility standard is not akin to a probability requirement").

Because CHB sufficiently pleads the other elements of its contractual claims, particularly with respect to REV's hire of Geiger, in violation of the Employment Agreement's two-year non-compete provision, and Geiger's solicitation of Mr. Borntrager, in violation of the Employment Agreement's two-year non-solicitation provision, the Court denies Defendants' motion with respect to CHB's breach of contract and tortious interference with contractual relations claims.[10]

### B.  The Fiduciary Duty Claims

CHB generally alleges that Geiger breached the "contractual, statutory, and common-law duties" he owed CHB and its shareholders. (Compl. ¶ 56.) Because CHB does not allege the existence of any particular contractual or statutory fiduciary duties, and only makes passing reference to the classic fiduciary duties of "care," "loyalty," and "good faith and fair dealing," the Court will simply address these three claims as one "fiduciary duty claim." (*Id.*)

### 1.  The Law[11]

---

[10]  Further, although the parties do not discuss the October 2011 Shareholder Agreement in their briefing, it appears that CHB also pleaded contractual claims against Geiger and REV with respect to that contract. (*See, e.g.*, Compl. ¶¶ 34, 43, 45; *see also* Geiger Am. Answer ¶ 24 (admitting that Geiger is still a shareholder of CHB).)

[11]  Although the parties' briefing interchangeably cites Delaware and Minnesota law with respect to this claim, the Court will apply Delaware law, as CHB is a Delaware corporation. *See Potter v. Pohlad,* 560 N.W.2d 389, 391 (Minn. Ct. App. 1997) ("The fiduciary duties of a corporation's officers and directors are generally governed by the law of the state of incorporation."). Moreover, because the parties do not present any arguments on this point, and, indeed, seem to agree that the choice of law question does not materially affect the outcome of this motion, the Court will not discuss this issue further. *See Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1034 (D. Minn. 2013) (declining to "undertake a *sua sponte* choice of law analysis" when the parties did not dispute the issue).

Under Delaware law, directors, officers, and, in some cases, controlling shareholders, owe their company fiduciary duties during the time that they hold that position. *See Arnold v. Soc. for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996) ("Fiduciary duties are owed by the directors and officers to the corporation and its stockholders."); *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation."); *see also* 8 Del. C. § 102(b)(7) (prohibiting a corporation from eliminating in a certificate of corporation a director's duty of loyalty to the corporation and its stockholders). Further, although a fiduciary duty may co-exist with a contractual duty, "a plaintiff may not 'bootstrap' a breach of fiduciary duty claim onto a breach of contract claim merely by restating the breach of contract claim as a breach of fiduciary duty." *Grunstein v. Silva*, No. 3932 (VCN), 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009). Put differently, "[b]ecause of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the parties' contractual relationship, a contractual claim will preclude a fiduciary claim." *Id*. (quoting *Solow v. Aspect Resources, LLC*, No. Civ-A-20397, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004)); *accord Renco Grp., Inc. v. MacAndrews AMG Holdings, LLC*, No. 7668 (VCN), 2015 WL 394011, at *8 (Del. Ch. Jan. 29, 2015) (dismissing breach of fiduciary duty claim where "the facts and harms cited in support of the fiduciary duty claims appear to be the same ones that underlie the breach of contract claims").

## 2. Analysis

Although the parties raise a variety of arguments about fiduciary duties in their briefing, the Court finds that CHB has failed to plead breach of fiduciary duty for one simple

reason: CHB does not allege a single plausible fact suggesting that Geiger breached his duties of loyalty, care, or good faith *while* employed as a director or officer at CHB. *Compare BelCom Inc. v. Robb*, No. Civ-A-14663, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) ("A former director, of course, breaches his fiduciary duty if he engages in transactions that had their inception *before* the termination of the fiduciary relationship or were founded on information acquired *during* the fiduciary relationship.") *with* Compl. ¶¶ 41-42 (detailing Geiger's (allegedly illegal) decisions to join REV and then contact a former colleague of his, both of which occurred *months after* Geiger's resignation from CHB).) Although CHB cursorily argues that it is plausible to presume that Geiger "took" confidential information from CHB while employed at the company, and then began using that information once he joined REV (*see* Pl.'s Br. at 37 n.2), the Complaint presents nothing "more than a sheer possibility that [Geiger] acted unlawfully" in this respect. *Iqbal*, 556 U.S. at 678.

Further, to the extent CHB argues that Geiger breached the "fiduciary duties" detailed in his Employment and/or Shareholder Agreements (*see* Pl.'s Br. at 34), those claims are "precluded" by the (still viable) contract claims described above. *See Renco Grp.*, 2015 WL 394011, at *8; *Grunstein*, 2009 WL 469851, at *6. More still, because CHB does not allege that Geiger is a controlling shareholder of CHB, Geiger did not continue to owe the company fiduciary duties merely because he owned stock in it. *See Ivanhoe Partners*, 535 A.2d at 1344.

For these reasons, the Court grants Defendants' motion with respect to CHB's breach of fiduciary duty claim, without prejudice.

### C.  The Trade Secret Claims

With respect to trade secrets, CHB brings claims against both Geiger and REV under the Minnesota Uniform Trade Secrets Act ("MUTSA"), *see* Minn. Stat. § 325C.01, *et seq*., and the federal Defend Trade Secrets Act ("DTSA"), *see* 18 U.S.C. § 1836.[12]

### 1. The Law

To successfully plead a claim under either the MUTSA or the DTSA, a plaintiff must allege facts plausibly detailing (1) the existence of a trade secret and (2) the misappropriation of that trade secret. *See Stratasys, Inc. v. Krampitz*, No. 17-cv-5524 (DSD/HB), 2018 WL 2247265, at *3-4 (D. Minn. May 16, 2018) (analyzing both claims together); *accord CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807-808 (D. Minn. 2018) (same, in context of preliminary injunction motion). A "trade secret" is defined in both the DTSA and the MUTSA as "information" that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 899 (8th Cir. 2005) (citing Minn. Stat. § 325C.01, subdiv. 5); *see* 18 U.S.C. § 1839(3). Although a plaintiff need not allege the nature of their trade secrets with a great deal of specificity at the pleading stage, it is well-established that, post-*Twombly* and *Iqbal*, a plaintiff company must describe their trade secrets with more than "conclusory statements," and with "sufficient information to infer more than a mere possibility of misconduct." *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc*., No. 13-cv-1356 (ADM/FLN), 2013 WL 6827348, at *3 (D.

---

[12]     Although the Complaint makes passing reference to the Delaware Misappropriation of Trade Secrets Act, too (*see* Compl. ¶¶ 64-65), the parties only discussed the Minnesota and federal statutes in their briefing. The Court will accordingly focus its discussion on those two statutes.

Minn. Dec. 26, 2013); *compare, e.g.*, *Superior Edge*, 964 F. Supp. 2d at 1042 (finding trade secret plausibly alleged where the at-issue software agreement was "rife with detail about what software was contemplated in the Development Plan, suggesting that the intellectual property over which [the plaintiff] claims trade secret designation [was] at least reasonably defined") *with Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1044 (D. Minn. 2010) (finding trade secret *not* plausibly alleged where plaintiff simply asserted that various "material on potential new products and business pricing and planning" a former employee downloaded before resigning were "trade secrets").

Moreover, "[c]ustomer lists, pricing information, long-term sales strategies, and customer buying habits do not necessarily constitute trade secrets." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 868 (D. Minn. 2015) (citing, *inter alia*, *United Prods. Corp. of Am. v. Cederstrom*, No. A05-1688, 2006 WL 1529478, at *5 (Minn. Ct. App. June 6, 2006)); *accord Harley Auto. Grp., Inc. v. AP Supply, Inc.*, No. 12-cv-1110 (DWF/LIB), 2013 WL 6801221, at *7 (D. Minn. Dec. 23, 2013) ("In Minnesota, customer lists have generally not been considered to be trade secrets."). This is especially so when this "market information" is stale, and, hence, of little use to a competitor. *See Fox Sports Net., LLC v. Minnesota Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003) (finding outdated financial information obsolete and holding that "obsolete information cannot form the basis for a trade secret claim because the information has no economic value"); *WEG Elec. Corp. v. Pethers*, No. 16-cv-471 (DSD/LIB), 2016 WL 1441793, at *3 (D. Minn. Apr. 12, 2016) (reasoning that information "four to twenty-four months old" had minimal "independent economic value," and noting that "[c]ustomer lists, pricing lists, and operation strategies may lose their economic value over

the course of a few months"); *Lexis–Nexis v. Beer*, 41 F. Supp. 2d 950, 959 (D. Minn. 1999) (declaring four month old knowledge of corporate business policies and strategies to be of little value and thus not a trade secret).

"Misappropriation," in turn, is defined as the "acquisition," "disclosure," or "use" of another's trade secrets by "improper means." *See* Minn. Stat. § 325C.01, subdiv. 3; 18 U.S.C. § 1839(5). The MUTSA defines improper means as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Minn. Stat. § 325C.01, subdiv. 2. The definition of misappropriation under the DTSA is, almost verbatim, the same. *See* 18 U.S.C. § 1839(5). Again, although exacting specificity is not required at the pleading stage, a plaintiff company must allege that the defendant disclosed, acquired, or used *some* particular trade secret in an improper manner. *Compare, e.g.*, *Superior Edge*, 964 F. Supp. 2d at 1042 (finding "misappropriation" of "trade secret software developments" plausibly alleged when defendant company "retained" the at-issue software following termination of licensing agreement and "continued to use" it, despite a clear agreement barring it from doing so) *with Schlief v. Nu-Source, Inc.*, No. 10-cv-4477 (DWF/SER), 2011 WL 1560672, at *7 (D. Minn. Apr. 25, 2011) (finding "misappropriation" *not* plausibly alleged by "mere" allegation that "Plaintiff gained access to Defendants' trade secrets and other confidential, competitive and proprietary information belonging to Defendant, including but not limited to, Defendant's customer and price lists").

Finally, as a general matter, a reasonable degree of specificity is important with respect to both elements of a trade secret claim, even at the pleading stage, because "[t]rade secrets

laws are meant to be a shield to preserve the trust in confidential relationships, 'not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience.'" *Katch*, 143 F. Supp. 3d at 867 (quoting *E.W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1112-13 (8th Cir. 1969)). This axiom strikes the Court as particularly relevant when a plaintiff company already has a contractual remedy available to it with respect to a former employee's allegedly illegal conduct. *See, e.g.*, *Search Partners, Inc. v. MyAlerts, Inc.*, No. 17-cv-1034 (DSD/TNL), 2017 WL 2838126, at *2 (D. Minn. June 30, 2017) ("The fact that [defendant company] may have circumvented [plaintiff company] by directly hiring [defendant former employee] may give rise to a contract or quasi-contractual claim, but it does not violate the DTSA."); *Luigino's, Inc. v. Peterson*, No. 00-cv-1246 (DWF/RLE), 2002 WL 122389, at *8 (D. Minn. Jan. 28, 2002) (explaining that plaintiff's claims of breach of contract may provide the appropriate avenue for remedy where confidential information is not protectable as a trade secret); *cf. CPI Card Grp.*, 284 F. Supp. 3d at 811-812 (noting that plaintiff's likelihood of success on breach of confidentiality agreement claim mitigated any harm arising from the Court's finding that plaintiff was not likely to succeed on trade secrets claim).

### 2. Analysis

Defendants here contend that CHB fails to plausibly allege either element of a trade secret claim. This is so, Defendants argue, because CHB's complaint simply couples "conclusory" recitations of the elements of a trade secret cause of action with "general" accusations that "broad categories" of CHB's business information constitute "trade secrets," and that, "upon information and belief" Geiger and REV "have used or will continue to use

such information in unlawful competition with CHB." (Defs.' Br. at 14-18 (citing, *e.g.*, Compl. ¶ 43).) Indeed, Defendants note, "CHB's factual basis for its [trade secrets] claim is so lacking, it alleges misappropriation in the hypothetical: 'If CHB's employees or ex-employees, directly or indirectly through others, misuse or improperly disclose CHB's Confidential Information to others, it would irreparably damage CHB.'" (*Id.* at 18 (quoting Compl. ¶ 17).) In response, CHB contends that it is only required to plead that Geiger had access to categories of "trade secrets," such as "customer lists" and "customer needs and preferences," and that Geiger and REV are likely to use this information to gain a competitive advantage over CHB. (*See* Pl.'s Br. at 25-26.) To the extent its pleading is inadequate, CHB avers, "[t]he proper motion in [this] case is a motion for a more definite statement under Rule 12(e), not a motion to dismiss under Rule 12(c)." (*Id.* at 27 (citing *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1178 (D. Minn. 2003)).)

The Court agrees with Defendants. As an initial matter, the Court is skeptical that the generic "market information" listed in CHB's complaint, *see supra* at 6, plausibly alleges a "trade secret" under either the MUTSA or the DTSA. Not only does CHB fail to describe this information with any specificity, *see Hot Stuff Foods*, 726 F. Supp. 2d at 1044, but the information was already months-old when Geiger joined REV, and is getting older with each passing day of litigation. *See Fox Sports Net.*, 319 F.3d at 336 (expressing skepticism about the "economic value" of stale market information).[13] Moreover, although CHB cites to some

---

[13]     Notably, unlike most trade secrets cases this Court has dealt with in recent years, CHB did not move to preliminarily enjoin Geiger or REV from using any particular system, document, or data that it deemed a trade secret. *Compare with, e.g.*, *CPI Card Grp.*, 294 F. Supp. 3d 791; *Katch*, 143 F. Supp. 3d 854.

District of Minnesota case law arguably suggesting that general labels like "customer lists" and "design plans" may sufficiently constitute trade secrets, at least at an early stage of litigation, those cases preceded *Twombly* and *Iqbal*, and are factually distinguishable. (*See* Pl.'s Br. at 25 (citing *Equus Comp. Sys., Inc. v. N. Comp. Sys., Inc.*, No. 01-cv-657 (DWF/AJB), 2002 WL 1634334 (D. Minn. July 22, 2002) and *SL Montevideo Tech.*, 292 F. Supp. 2d at 1178).) For instance, in *Equus*, the plaintiff provided evidence at a TRO hearing that the identity of a particular computer system customer was highly proprietary and sensitive information, and, in *SL Montevideo*, the plaintiff alleged that its design plans for a unique kind of commercial aircraft motor constituted a "trade secret." Suffice it to say, CHB's general allegations concerning its "customer lists" and "customer needs and preferences" are distinguishable from those cases. (Compl. ¶ 13.)

However, the Court need not definitely resolve whether CHB plausibly alleged the existence of a trade secret because, in either event, CHB plainly fails to allege that either REV or Geiger actually "misappropriated" any information CHB deemed a "trade secret." Simply put, the Complaint contains no plausible factual allegation that Geiger (much less REV) "acquired, disclosed, or used" any particular CHB trade secret by "improper means." *See* Minn. Stat. § 325C.01, subdiv. 3; 18 U.S.C. § 1839(5). Mere fears that a company's former employee *might* have taken (completely undefined) trade secrets with him on his way out the door, and that that employee's new employer *might* use these trade secrets to their advantage, at some unknown future date, do not give rise to a plausible claim of trade secret misappropriation. *Accord Schlief*, 2011 WL 1560672, at *7. As such, this case is distinguishable from recent decisions allowing a misappropriation claim past the motion to

dismiss stage. *See, e.g.*, *Stratasys, Inc.*, 2018 WL 2247265, at \*1 (plaintiff alleged that defendant (a former employee) "sent [large amounts of] confidential information to his [own] email account and downloaded files to a portable USB," while still employed with plaintiff, and then "used [plaintiff's] confidential information and trade secrets to build his own competing [3D printing] business"); *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL 3327570, at \*2 (D. Minn. Aug. 3, 2017) (plaintiff alleged that defendant (a former employee) "retained over 740 [trade secret] files on his USB devices relating to [plaintiff's] longstanding customer," and then used this proprietary information to steal that customer from plaintiff during a head-to-head "RFP process").

Finally, although CHB may be correct that Defendants *could* have filed a motion for a more definite statement under Rule 12(e), in lieu of this motion (*see* Pl.'s Br. at 27), that strategic decision in no way releases CHB from its burden of pleading "a claim to relief that is plausible on its face," under *Twombly*, *Iqbal*, and this District's recent cases applying those standards in the trade secret context. *Iqbal,* 556 U.S. at 678.

For these reasons, the Court grants Defendants' motion with respect to CHB's MUTSA and DTSA claims, without prejudice.

**D.  The Miscellaneous Claims**

Because CHB's final three claims against Geiger and REV – its unfair competition, tortious interference with actual and prospective business relations, and unjust enrichment claims – can be dispatched with limited discussion, the Court designates them "miscellaneous claims."

**1.  Unfair Competition**

"[U]nder Minnesota law, [u]nfair competition is not a tort with specific elements, but rather, it describes a general category of torts which courts recognize for the protection of commercial interests." *CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 834 (D. Minn. 2007) (quoting *LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1490 (D. Minn. 1996)). "In order to pursue a claim for unfair competition," then, "a plaintiff must identify the underlying tort that is the basis for the claim," such as "tortious interference with economic advantage" or "misappropriation of trade secrets." *CPI Card Grp.*, 294 F. Supp. 3d at 822 (citing *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1142 (D. Minn. 2011)). However, "if the underlying tort is duplicative of another Count of the Complaint, the claim for unfair competition cannot stand." *CardioVention*, 483 F. Supp. 2d at 834; *accord Stratasys, Inc.*, 2018 WL 2247265, at *4 (dismissing "unfair competition" claim because it was "based on defendants' alleged misappropriation of [plaintiff's] confidential information and [defendant's] breach of the Agreement, which also underpin the breach of contract, breach of duty of loyalty, DTSA, and MUTSA claims"); *AgInformationData, LLC v. Integrated Sols. Grp., Inc.*, No. 11-cv-3673 (DWF/JSM), 2014 WL 4348209, at *12 (D. Minn. Sept. 2, 2014) (same); *ACIST Med. Sys., Inc., v OPSENS, Inc.*, No. 11-cv-539 (ADM/JJK), 2011 WL 4640884, at *5 (D. Minn. Oct. 4, 2011) (same); *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1034-35 (D. Minn. 2003) (same).

Here, CHB's unfair competition claim fails because it is entirely duplicative of CHB's other claims, namely, its contractual, fiduciary duty, and trade secret claims. (*See* Compl. ¶ 81 (alleging that "Defendants' use, disclosure, and/or misappropriation of CHB's confidential and trade secret information; Defendant Geiger's deliberate and intentional violation of his

contractual obligations to CHB, including his unlawful competition with CHB, and actual and attempted recruitment of CHB's employees; and Defendants' unlawful competition with CHB and attempted solicitation of CHB's customers, have all resulted in the commission of acts of unfair competition").) Although CHB argues that it has identified a non-duplicative tort underlying its "unfair competition claim," namely "misuse of confidential information," and cites this Court's *CPI Card Grp.* decision in support of that argument, CHB misses the mark. (*See* Pl.'s Br. at 41.) In *CPI Card Grp.*, this Court noted that, because "confidential information is broader than trade secret information," "a claim of unfair competition based on misuse of confidential information is not wholly subsumed by a trade secrets misappropriation claim." *CPI Card Grp.*, 294 F. Supp. 3d at 822. As such, the Court found that an "unfair competition" claim could proceed against the company defendant ("MPS") because plaintiff CPI's complaint did *not* include a claim against MPS related to its "misuse of confidential information" (as opposed to misuse of trade secrets); rather, CPI's complaint only included a "breach of confidentiality agreement" claim against the *individual*, ex-employee defendant. *Id.* Here, by contrast, CHB included a "breach of contract" claim against Geiger, *in addition to* a "tortious interference with contractual relations" claim against REV. Thus, any allegations concerning misuse by either REV or Geiger of CHB's confidential information, in breach of the confidentiality provision of the Employment Agreement (or Shareholder Agreement), are "duplicative of [other] Count[s] of the Complaint." *CardioVention*, 483 F. Supp. 2d at 834. Accordingly, CHB's "claim for unfair competition cannot stand." *Id.*

27

For these reasons, the Court grants Defendants' motion with respect to CHB's unfair competition claim, without prejudice.

### 2.   Tortious Interference with Actual and Prospective Business Relations

Under Minnesota law, a claim for "tortious interference with actual and prospective business relations," when pled alongside a claim for "tortious interference with contractual relations," is simply deemed a claim for "tortious interference with prospective economic advantage." *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 216 (Minn. 2014). This claim consists of five elements: "(1) the existence of a reasonable expectation of economic advantage; (2) defendant's knowledge of that expectation of economic advantage; (3) that defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (4) that in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and (5) that plaintiff sustained damages." *Id.* at 219. Courts in this District have dismissed tortious interference with prospective economic advantage claims when the plaintiff "identifi[es] no prospective business relationship with [a third party] that it was unable to pursue or lost out on because" of the defendant's conduct, or "fails to identify any reasonable expectation of a prospective business relation . . . with which [the defendant] interfered." *Superior Edge*, 964 F. Supp. 2d at 1044-45; *accord Schlief*, 2011 WL 1560672, at *8 (dismissing tortious interference claim where plaintiff "failed to identify a single contract or prospective business relation with which [defendant] allegedly interfered"); *Hot Stuff Foods*, 726 F. Supp. 2d at 1043-44 (same).

Here, CHB's claim for tortious interference with prospective economic advantage fails because CHB does not identify any specific customers or business relations it has lost, or may lose, due to Geiger and REV's conduct. (*See* Compl. ¶¶ 92-94 (generically alleging that Geiger and REV "knew of," and "intentionally interfered with," CHB's "reasonable expectation of economic advantage with CHB's customers, prospective customers, and employees").) Indeed, the Complaint only mentions one CHB customer, TEMSA. (*See, e.g.*, *id.* ¶¶ 9-10.) Notably, however, the Complaint does not allege that REV or Geiger's actions have had a negative impact on TEMSA's relationship with CHB, much less an "intentionally" negative impact. *Gieseke*, 844 N.W.2d at 219.

For these reasons, the Court grants Defendants' motion with respect to CHB's tortious interference with actual and prospective business relations claim, without prejudice.

### 3. Unjust Enrichment

"In Minnesota, to state a claim for unjust enrichment, 'the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay.'" *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1099 (D. Minn. 2017) (quoting *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996)). However, under *Twombly* and *Iqbal*, a plaintiff must rely on more than "conclusions and labels," and must plausibly allege facts showing the "something of value" that the defendant received. *See City Ctr. Realty Partners, LLC v. Macy's Retail Holdings*, No. 17-cv-528 (SRN/TNL), 2017 WL 4081896, at *12 (D. Minn. Sept. 13, 2017) (dismissing unjust enrichment claim where plaintiff's "pleading [did] not identify the 'something of value' that it allegedly received," but, rather, "simply alleg[ed] that 'Macy's

29

has been unjustly enriched and City Center has been unjustly damaged in an amount in excess of $50,000'"); *accord Schlief*, 2011 WL 1560672, at *8 (dismissing unjust enrichment claim where the complaint "contained no more than a recitation of legal arguments"). Further, "under Minnesota law, 'the existence of an express contract between the parties precludes recovery under the theor[y] of . . . unjust enrichment." *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1085-86 (D. Minn. 2013) (quoting *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998)) (dismissing unjust enrichment claim due to existence of express contract); *see also U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("[E]quitable relief cannot be granted where the rights of the parties are governed by a valid contract.").

Here, CSM's claim for unjust enrichment fails because its complaint contains only legal conclusions, and does not allege any specific facts plausibly showing that Geiger and REV "knowingly received or obtained something of value for which [they] in equity and good conscience should pay.'" *Luckey*, 245 F. Supp. 3d at 1099. Although the Complaint obliquely references "intimate knowledge of CHB's motor coach and bus business" that Geiger purportedly "used and/or shared with his new employer REV" (Compl. ¶ 77), the Complaint does not then plausibly allege facts explaining how this knowledge was "of value" to REV. *Accord City Ctr. Realty Partners*, 2017 WL 4081896, at *12. Moreover, to the extent CHB bases its unjust enrichment claim on Geiger's violation of the confidentiality provision in his Employment Agreement (and REV's tortious interference with that contract), the existence of that "express contract" bars CHB's unjust enrichment claim as a matter of law. *See Damon*, 937 F. Supp. 2d at 1085-86.

For these reasons, the Court grants Defendants' motion with respect to CHB's unjust enrichment claim, without prejudice.

## III.   ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on the Pleadings [Doc. No. 15] is **GRANTED IN PART AND DENIED IN PART, WITHOUT PREJUDICE**.

Further, because this Order deprives the Court of original subject matter jurisdiction over this lawsuit, leaving only "discretionary" supplemental jurisdiction under 28 U.S.C. § 1367(c)(3), the parties are **ORDERED** to show cause as to why this action should remain before this Court. *See Barstad v. Murray Cty.*, 420 F.3d 800, 888 (8th Cir. 2005) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

The parties may either jointly or separately submit a short letter brief on this matter, no longer than 2 pages each. The parties' briefing will be due seven days after completion of the settlement conference with the Magistrate Judge, currently scheduled for May 2, 2019. (*See* Doc. No. 29.)

Dated:  March 20, 2019                          s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge